UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

CALVIN B. WARE,

                    Petitioner,                 Case No. 1:16-cv-1034

v.                                            Honorable Gordon J. Quist

SHAWN BREWER,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Calvin B. Ware is incarcerated with the Michigan Department of Corrections at the G. Robert Cotton Correctional Facility (JCF) in Jackson County, Michigan. On January 29, 2013, an Ingham County Circuit Court jury found Petitioner guilty of first-degree murder, MICH. COMP. LAWS § 750.316, being a felon in possession of a firearm (felon in possession), MICH. COMP. LAWS § 750.224f, possession of a firearm during the commission of a felony (felony firearm), MICH. COMP. LAWS § 750.227b, and being a fourth-offense felony offender, MICH. COMP. LAWS § 769.12. On February 27, 2013, the court imposed sentences of life imprisonment without parole on the murder conviction, four to ten years' imprisonment on the felon-in-possession conviction, and a consecutive two years' imprisonment on the felony-firearm conviction.[1]

_____

[1] Petitioner alleges that the life imprisonment sentence mooted the fourth habitual offender findings.

On August 17, 2016,[2] Petitioner filed his habeas corpus petition raising five grounds for relief, as follows:

I.      [PETITIONER'S] CONVICTIONS FAIL THE SUFFICIENCY OF EVIDENCE TEST.  REVERSAL [I]S THEREFORE WARRANTED, US CONST AM XIV.

II.     THE ADMISSION OF IMPROPER HEARSAY DENIED [PETITIONER] HIS RIGHT TO A FAIR TRIAL.  A NEW TRIAL IS WARRANTED.

III.    [PETITIONER] WAS DENIED A FAIR TRIAL WHEN THE LEAD POLICE INVESTIGATOR TWICE OPINED TO THE JURY THAT [PETITIONER] WAS THE SHOOTER.  THE ERROR IS PLAIN.  IF NECESSARY, DEFENDANT ARGUES THAT []TRIAL COUNSEL WAS INEFFECTIVE.  A NEW TRIAL IS REQUIRED.  US CONST AM. V, VI, XIV; MICH CONST, ART 1 §§ 17, 20.

IV.     [PETITIONER] WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT DENIED HIS REQUEST FOR A VOLUNTARY MANSLAUGHTER INSTRUCTION.  A NEW TRIAL IS WARRANTED.  US CONST AM VI, XIIV; MICH CONST ART 1, § 17.

V.      [PETITIONER'S] STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE VIOLATED WHERE THE PROSECUTION FAILED TO SHOW THE REQUISITE IDENTIFICATION OF [PETITIONER] AS THE SHOOT[ER] IN FACT.

---

[2] Under Sixth Circuit precedent, the application is deemed filed when handed to prison authorities for mailing to the federal court.  *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002).  For purposes of this Report and Recommendation, I have given Petitioner the benefit of the earliest possible filing date.  *See Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (holding that the date the prisoner signs the document is deemed under Sixth Circuit law to be the date of handing to officials) (citing *Goins v. Saunders*, 206 F. App'x 497, 498 n.1 (6th Cir. 2006)).

(Pet., ECF No.1, PageID.6-11.)  Respondent has filed an answer to the petition (ECF No. 5), stating that the grounds should be denied because they are either procedurally defaulted or lack merit.

Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless.  Accordingly, I recommend that the petition be denied.

## Discussion

I.    Factual allegations

The conviction at issue in the instant case arises out of the shooting death of Desmond Dorris on December 20, 2011, at the Capital Area Transportation Authority (CATA) bus terminal in Lansing.  Petitioner was charged with one count of open murder, one count of assault with intent to commit murder, and felony firearm.  The complaint was amended at the preliminary examination, held on March 15, 2012, to replace the charge of assault with intent to murder with assault to do great bodily harm less than murder (GBH) and to add one count of felon in possession of a firearm. (Prelim. Exam. Tr., ECF No. 6-2, PageID.165.)  The parties also stipulated to the underlying felony offense for felon in possession from February 3, 2006.  (*Id.*)  The district court found that, while the evidence of identification was thin, it was sufficient to bind Petitioner over on all charges for trial in the circuit court.  (*Id.*, PageID.241-243.)

Petitioner moved in the circuit court to quash the information, on the grounds of insufficient evidence supporting the identification of Petitioner as the shooter.  At

a hearing held on January 24, 2013, the trial court determined that, on review of the preliminary examination, the motion would be denied.  (Mot. to Quash Hr'g, ECF No. 6-4, PageID.258-259.)  The court also partially granted the defense motion for funds to hire an identification expert up to $2,000.00.  (*Id.*, PageID.261-262.)

Tadessa Marie Kemp (a/k/a Tadessa Marie Johnson), a critical witness, failed to appear at the preliminary examination, despite being served with a subpoena, and she later failed to appear for another matter.  Accordingly, being concerned that she would not appear at trial despite a subpoena, the prosecutor moved for a writ compelling her to appear before the court as soon as possible.  At a hearing held on January 9, 2013, the trial court issued the requested order.  (Mot. for Writ of Capias, ECF No. 6-5, PageID.269.)  Johnson/Kemp appeared at a hearing on January 18, 2013, explaining that she was in the middle of a high-risk pregnancy, had previously been hospitalized for that risk, and had received the writ while in the hospital.  She testified that she had to attend her medical appointments and provided evidence that she was at an appointment when she was last required to appear.  Upon review, the court determined that Kemp would not be held in jail until the trial, but she would be required to be on a tether during the intervening period.  (Hr'g on Writ, ECF No. 6-6, PageID.274-277.)

Petitioner was tried before a jury over the course of five days.[3]  Lansing Police

---

[3] The Court will reference trial transcripts as follows:
Trial Transcript for January 22, 2013: (T. Tr. I, ECF No. 6-7, PageID.___);
Trial Transcript for January 24, 2013: (T. Tr. II, ECF No. 6-8, PageID.___);
Trial Transcript for January 25, 2013: (T. Tr. III, ECF No. 6-9, PageID.___);
Trial Transcript for January 28, 2013: (T. Tr. IV, ECF No. 6-10, PageID.___);

Officer Phil Bailey, assisted by Officer Linn Kentner, reported to the CATA bus station on December 20, 2011, at about 3:00 or 3:30 p.m., in response to a report of a shooting.  After waiting to determine whether the assailant was still in the station, Officer Bailey went to where the victim was located, on the ground next to a bench outside the station.  (T. Tr. II, ECF No. 6-8, PageID.451-452.)  He found a woman applying direct pressure to the side of the victim's neck.  Officer Bailey called the fire department to assist, and then he began searching for witnesses.  He spoke with Ms. Field after the victim was in the ambulance.  He also spoke to two witnesses who had called into dispatch.  In addition, Mr. Manning approached him at the scene and told him that he had seen something.  (*Id.*, PageID.454.)  Officer Bailey testified that Ms. Field was agitated and told him only that she had seen an object.  She did not mention having seen a gun, and she identified no one as the assailant.  (*Id.*, 455.)

Lansing Police Officer Linn Kenter testified that, when he arrived at the station with Officers Bailey and Curtis, he met with CATA security officer Adam McNeal, who told him that he believed he had the shooting on video.  Officer Kentner testified that the video showed a black male standing in the commerce area of the concourse, with his hand on the exit door.  The man wore a dark, hooded sweatshirt, black pants, and white shoes.  (*Id.*, PageID.456-457.)  Officer Kentner broadcast the description to other officers.  He also took information from two witnesses:  a Ms. Robinson and Ms. Tedessa Johnson.  From both witnesses, Officer Kentner learned the nickname of the alleged shooter, "Pac," which he broadcast to other officers.  (*Id.*,

---

Trial Transcript for January 29, 2013: (T. Tr. V, ECF No. 6-11, PageID.___).

PageID.456-458.)

Police Sergeant Leith Curtis arrived at the CATA station around the same time as Officers Bailey and Kentner. Sergeant Curtis assisted the victim and later assisted the emergency medical people. He also took charge of seeing that the crime scene was preserved. (*Id.*, PageID.458-459.) He thereafter called the crime scene investigators and sought a K-9 team to possibly track the assailant. The team responded, but it did not end up tracking the assailant. Sergeant Curtis again provided a radio description of the alleged perpetrator, contacted the detectives, and conducted a search of the area for additional evidence. (*Id.*, PageID.460.) Officers checked dumpsters and trash cans in the blocks around the station, looking for a gun. (*Id.*, PageID.461.) Sergeant Curtis acknowledged that Mollie Field, the woman who was sitting with the victim, claimed not to know who fired the gun. (*Id.*, 462-463.)

Randy Hackenberg worked as a security officer at the CATA bus station on the day of the shooting. His supervisor, Tim Kinney, and another security officer, Ed McNeal also were on duty. Mr. Hackenberg heard yelling from the smoking area, and he and Mr. Kinney ran down to the area. They found a large group of people surrounding a man who was on the ground, holding his head. The officers cleared people back from the scene and contacted the police. Mr. Kinney tried to give first aid. Mr. Hackenberg attempted to gather witnesses and secure the area until law enforcement arrived. (*Id.*, PageID.464.) Mr. Hackenberg knew the victim as someone who had been banned from the station, whose photograph was included in a file of information on banned individuals. He identified the photograph from that file.

6

According to Mr. Hackenberg, the CATA station had 32 security cameras, which connect to the security office, where officers can replay videos 24 hours a day.  (*Id.*, PageID.465-66.)  Mr. Hackenberg identified the video of the incident, which was provided to the police by Ed McNeal.  (*Id.*, PageID.466.)  Mr. Hackenberg also identified a picture of the banned individual "Calvin," whom he believed was "Pac." When he was in the crime-scene area, he kept hearing comments to the effect that Pac had been the shooter.  (*Id.*, PageID.468.)

Lansing Police Officer John Cosme testified that he followed up on the homicide by contacting Randy Hackenberg.  At that point, Mr. Hackenberg identified the suspect as "Pac," and he provided the banned-person photograph.  Officer Cosme had heard the nickname before.  He contacted Detective St. Aubin and gave him information about who the shooter might be.  Detective St. Aubin told Officer Cosme that Pac had an associate named "Buck."  Officer Cosme checked the LEIN system and found a license plate linked to Pac and Buck, registered in Petitioner's name. (*Id.*, PageID.469-470.)  Officer Cosme understood that people called Petitioner "Pac" because he looked like Tupac Shakur, the rapper.  Officer Cosme pulled the driver's license photograph for Petitioner and recognized the photograph.  (*Id.*)

Crime scene investigator Terry Blount identified photographs and videos that he took of the crime scene, the CATA station, and the surrounding area.  (*Id.*, PageID.470-475.)  He also identified his own sketch of the scene.  In addition, Mr. Blount identified the suspected crack cocaine found under the green bench on which the victim was sitting.  (*Id.*, PageID.476.)  Mr. Blount further collected five latent

fingerprints from the glass of the southwest door.  (*Id.*, PageID.477.)

Detective Brad St. Aubin headed the investigation of the incident.  The CATA security video was played for the jury, and Detective St. Aubin testified that the various camera angles showed the suspect walk in from the west side of the station. The man was wearing dark clothing, a grayish jacket with a hooded sweatshirt partially covering his face, and white tennis shoes.  (*Id.*, PageID.480.)  The detective could not identify the man's face at that time.  But another camera in the terminal showed a long-time friend of Petitioner named Philip Fraser a/k/a Buck Rogers.  In the video footage, Mr. Fraser does a double-take and looks at the victim and the shooter as he passes the shooter.  (*Id.*, PageID.481.)  Mr. Fraser quickly walks to the vicinity of the shooting and stops to talk with some people.  The shooter continues south in the terminal, reaches to move something into his waistband, and goes through the door.  The shooter's head comes up as he passes Mr. Fraser, and he extends his arm.  (*Id.*, PageId.482.)  Molly Field can be seen next to the doorway. People begin to run around.  The shooter runs west on Lenawee Street and then turns south.  He appears to be crouched and trying to hide something, with his hood pulled up.  (*Id.*, PageID.483.)

Concordia University student Antonio Manning testified that he lived in Lansing at the time of the shooting and that he frequently used the CATA buses and bus station.  On December 20, 2011, he was at the station, getting ready to transfer to another bus.  Mr. Manning knew Randy Hackenberg, and he was talking to Mr. Hackenberg and Mr. Kinney when he saw a man walking with his head down in the

southern part of the station.  (*Id.*, PageID.486.)  The man seemed as if he did not want
to be seen by security.  Mr. Manning could not see the man's face, as he was dressed
in an olive green jacket with the collar turned up.  As Mr. Manning and the guards
approached the security office, he heard a small pop, which he did not immediately
recognize as a shot.  Then someone ran inside, saying, "Somebody has been shot, Pac
shot him.  Pac shot him."  (*Id.*, PageID.487.)

Mr. Manning and Mr. Hackenberg ran down to see if they could help.  Other
security guards went to the security office to call 911.  When Mr. Manning reached
the south end of the building, he went through the exit.  He saw someone who
appeared to be the man in the olive coat he had seen in the station.  (*Id.*, PageID.488-
89.)  The man headed west on Lenawee toward Washington.  Mr. Manning called 911.
He then noticed the victim, who was bleeding, and he asked the victim's girlfriend
where he was bleeding from.  The woman kept saying, "Oh, my God, oh, my God.  I
can't believe this. . . . Don't die on me. . . . Pac, I believe, who did this.  It was Pac who
shot him.  I know, I seen it.  Oh, my God."  (*Id.*, PageID.488.)  According to Mr.
Manning, other individuals began to make threats to "get" the shooter."  (*Id.*)  Mr.
Manning testified that he did not know the woman, but he had seen her at the bus
station before.  Mr. Manning did not know the victim.  (*Id.*)  The prosecutor then
played Mr. Manning's 911 call.  (*Id.*, PageID.489.)

Tedessa Kemp (née Johnson) testified that she was twenty years old and had
lived in Lansing all her life.  She took the bus Monday through Friday, twice a day to
get to class and work.  (*Id.*, PageID.491.)  Ms. Kemp knew Mollie Field to say hello,

but was not a friend.  Ms. Kemp also knew Desmond Dorris, who had previously been to her house, and she knew that Ms. Field and Mr. Dorris were girlfriend and boyfriend.  (*Id.*, 492, 496.)  In addition, Ms. Kemp knew Petitioner as "Pac," because she saw him nearly twice daily at the station, but she did not know his full name until after the shooting.

When the shooting occurred she was on the number 2 bus, on her way from community service. (*Id.*, PageID.492.)  Ms. Kemp was sitting next to the window.  As the bus approached the station, she heard a popping noise, which she subsequently realized was a gunshot.  She looked out the window and saw Pac running and saw the shine of a silver gun in his right hand, as he looked over his shoulder to the CATA station.  (*Id.*, PageID.493, 495-496.)  Pac was wearing dark jeans, dark shoes, and a forest green army-colored jacket, with a hood over his head.  She routinely saw him in the same jacket during the cold weather.  (*Id.*, PageID.493.)  She got off the bus to see what was going on.  She called for an ambulance on her phone.  The prosecutor played her 911 call.  Ms. Kemp explained some inconsistencies in her responses to the 911 operator, because she was talking to others at the same time.  She said that she had seen what was happening, but she did not see the shooting.  She simply put together the shot she heard with seeing Pac run off with a gun.  (*Id.*, PageID.495.) Fingerprint technician Kenneth Lucas testified that he received five latent fingerprint lifts provided by Officer Blount.  He was able to identify one latent print from the southwest door on the interior side as coming from a man named Terry Linn Keck.  (T. Tr. III, ECF No. 6-9, PageID.504.)

10

Lansing Police Officer Wendy Prince testified that she was dispatched to the CATA bus station, and she arrived after other officers. She was instructed to follow the ambulance to the hospital to determine the injuries. When she got to Sparrow Hospital, she learned that the victim was Desmond Deshawn Dorris, and she saw that he had a hole in his jaw and one in his head, as well as a large bruised area under the arm. He was reported dead at 3:58 p.m. Officer Prince took possession of the victim's clothing and personal effects, including his phone and $120.00 in cash. (*Id.*, PageID.506-507.)

Traci Ahner testified that, in December 2011, she was a regular user of CATA transportation. She knew Desmond Dorris well. They called each other brother and sister and were involved in each other's lives. Mr. Dorris was 31 years old when he was shot. He cleaned buildings following the eviction of tenants. (*Id.*, PageID.508.) He also sold drugs to make money. Mr. Dorris frequently spent time at the CATA station, selling drugs. Ms. Ahner and Mollie Field lived in a house together with Mr. Dorris. Ms. Field and Mr. Dorris had been in a relationship for five years. Ms. Ahner was at the CATA station at the time of the shooting. She knew Pac, whom she identified as Petitioner, from seeing him at the CATA station every few days. Ms. Ahner heard the gunshot and heard Ms. Field, screaming, "No, Des, Des." (*Id.*, PageID.509). She ran around the corner and found Mr. Dorris lying on a bench. She applied pressure to his neck. (*Id.*, PageID.509-510.) Ms. Field was terrified, screaming things such as, "No, Des, no. You got to stay for us. Jordan needs you. Evan needs you. I need you. . . . You have to stay for us. It was Pac, it was Pac. Pac

11

shot him.  It was Pac." (*Id.*, PageID.510.)

After the ambulance arrived, Ms. Ahner ran to get on a bus that would take her to the hospital.  At the hospital, she talked to an officer briefly.  She was frightened and did not want to talk to the police.  (*Id.*, PageID.511.)

Johanes Wagemaker testified that he was a master plumber who worked statewide.  On December 20, 2011, he was working on the Porter building at 505 Townsend, doing some boiler replacements.  When he went outside to get a thermometer from his van, he heard a gunshot in the distance.  A couple of minutes later, as he was digging in his van, someone brushed by him, startling him.  Then a second man on a bicycle came up and said to the first man, "[Y]ou killed my ears with that." (*Id.*, PageID.515.)  The man who rushed by was wearing a dark green or gray puffy coat.  (*Id.*)  The following day, an officer approached him with a photograph, and Mr. Wagemaker recognized the first man in the green coat.  The court heard lengthy arguments about the admissibility of the second man's statement, holding that it was admissible as a present sense impression.  (*Id.*, PageID.516-519.)  Mr. Wagemaker identified Petitioner as the man in the green coat.  (*Id.*, PageID.520.)

Mollie Field testified that she had two children and was romantically involved with Mr. Dorris for four years.  Mr. Dorris sold drugs for a living, but also had a job toward the end.  Mr. Dorris sold drugs regularly at the CATA station.  Ms. Field also knew Tedessa Johnson from the CATA station, and she knew Ms. Johnson lived near her last apartment.  According to Ms. Field, she had met Traci Ahner through Mr. Dorris, and in December of 2011, they were all living together.  Ms. Field testified

that she had known Petitioner as Pac for about a year, from seeing him at the bus station. (*Id.*, PageID.521-522.)

Petitioner and Mr. Dorris knew each other, but they were not close.    In December 2011, there was ill feeling between them, because about a month before the shooting, Pac said something to another person about one of Ms. Field's children. Pac and Mr. Dorris got into a fight, in which Mr. Dorris roughed up and spit on Pac. She learned about the fight from others.    On the day of the shooting, Ms. Field and her sons arrived at the station at 10:30 or 11:00 a.m. to meet Mr. Dorris.    She knew that he was expecting to be paid.    The boys stayed at the station until about 30 minutes before the shooting, when she sent them home.    At about 3:00 p.m., Mr. Dorris and she went to the cafeteria and got a hot chocolate.    Buck was in line in front of them, which Mr. Dorris pointed out to Field.    Ms. Field had seen Buck before, and he was usually with Petitioner.    (*Id.*, PageID.523-524.)

After they bought their hot chocolate, they sat down, and Mr. Dorris was rubbing her back and talking to her for about ten minutes.    They then went outside to smoke, sitting on the outside bench.    Suddenly, she felt an arm go across her chest and heard a big bang.    (*Id.*, PageID.524.)    When the bang occurred, she saw a silver gun.    She began screaming Mr. Dorris' name, as he was shot in the neck.    She then started screaming, "Pac did it, Pac did it."    (*Id.*, PageID.525.)    She realized it was Pac as he was running away.    Ms. Ahner came running over, as did a security guard. They moved Mr. Dorris from the bench to the ground.    She kept telling Mr. Dorris to stay alive, but he did not respond.    (*Id.*)

Many people were around, and she remembered speaking with two officers at some point, but she was in shock. Ms. Field did not yet know if Mr. Dorris was dead. She did not tell the officers at that time that she saw a gun, and she did not tell them it was Pac. Ms. Field testified that she did not tell them it was Pac, because, if Mr. Dorris survived, he would not want her to snitch. (*Id.*, PageID.526-527.)

The officers took her to the police station and placed her in a room. Detective St. Aubin came in and asked questions. She lied at first, but he yelled at her. When she learned Mr. Dorris had died, she began to tell the truth. She told Detective St. Aubin that Pac did it. Ms. Field testified that she believes she told him about the gun. (*Id.*, PageID.527.) Detective St. Aubin showed her a photographic lineup, from which she tentatively identified Petitioner, but she could not be sure because Petitioner looked darker and heavier in the photograph. The court admitted the lineup photographs. (*Id.*, PageID.528.)

Ms. Field was shown a second lineup the following day, and she was able to positively identify Petitioner in the second lineup because the photograph of Petitioner was much better. (*Id.*, PageID.529.) Ms. Field also was shown the somewhat grainy video of the shooter. She identified Petitioner based on his physique, body, walk, and jacket, all of which were familiar to her from seeing him daily. (*Id.*, PageID.530.)

Bus driver Colleen Whalen testified that she was driving the Route-2 bus on December 20, 2011. She was turning her bus into the station from Washington Street left on to Lenawee, at the time of the shooting. She heard a gunshot and felt the

14

reverberation as she turned the corner.  She then saw people running and scattering. (*Id.*, PageID.537.)  She saw a black male wearing a green "flap jacket" and black pants, running in front of her bus.  (*Id.*, PageID.538.)  The man appeared to be trying to conceal something he had in one hand.  Ms. Whalen made eye contact with the man as he neared the fence.  She then saw another man follow, and the two men looked at each other.  (*Id.*)  Although part of the first man's face was covered by a hood, Ms. Whalen was able to identify Petitioner.  She watched him for three to five seconds.  As she pulled into the station and looked to her right, she saw a man lying on the ground.  (*Id.*, PageID.539.)

Michigan State Police employee Jeff Amley testified as an expert in firearms and tool marks.  (T. Tr. IV, ECF No. 6-10, PageID.546-547.)  Mr. Amley examined a fired bullet recovered from the victim.  He concluded that the bullet was consistent with being fired from a .38 caliber, .357 caliber, or 9 millimeter weapon.  He could not determine any rifling characteristics.  Mr. Amley testified that, if a revolver was used, no cartridges would be expected to be found at the scene.  (*Id.*, PageID.548.)

James Brown testified that he was in jail with Petitioner for a couple of months.  At some point during their daily conversations, Petitioner told Mr. Brown that he had gotten into an altercation with a man (Desmond Dorris), who had spit on him.  Petitioner told Mr. Brown that, as soon as the man got out of jail, Petitioner "went down there and took care of business."  (*Id.*, PageID.550.)  Petitioner later said that he shot Mr. Dorris.  (*Id.*, PageID.554.)  Petitioner also told Mr. Brown about others involved in the incident, namely Traci and Mollie.  According to Mr. Brown,

15

another prisoner was going to talk to Traci and Mollie to keep them from testifying against Petitioner.  In addition, Petitioner mentioned a female bus driver who had seen Petitioner running away from the bus station.  (*Id.*, PageID.551.)  Petitioner further talked about his hit man, "D."  (*Id.*)  Mr. Brown acknowledged that he faced federal charges for carrying a concealed weapon with a maximum sentence of ten years.  Mr. Brown indicated that he had made no agreement with the federal prosecutor in exchange for his testimony.  (*Id.*, PageID.552.)

Detective Brad St. Aubin testified that, when he interviewed Mollie Field, she was wound up and in shock.  She immediately asked him if Mr. Dorris was dead, but she did not appear to trust his answer.  She was cooperative on some things and tried to minimize the drug involvement.  At some point Detective St. Aubin yelled at Ms. Field, and she then began to tell him the truth.  Ms. Field told Detective St. Aubin that the shooter was Pac, and she described him as being about 5-foot-5 and 150 pounds.  Ms. Field adamantly denied knowing Pac's real name or where he lived. Detective St. Aubin let Ms. Field leave the station at about 6:00 p.m., but he told her to keep her phone with her so that she could be reached.  (*Id.* at 556.)

At that point, Detective St. Aubin quickly interviewed some other witnesses, through which he identified the suspect as Petitioner.  The detective put together a photo lineup and showed it to Ms. Field at about 1:00 a.m.  (*Id.*, PageID.557.)  Ms. Field pointed to Petitioner's photograph, but she was concerned that the photograph showed someone a bit darker and heavier than Pac.  The following day, he showed a second photo array to Ms. Field, this time using a different photograph of Petitioner.

16

Ms. Field immediately identified Petitioner.  Detective St. Aubin then looked at the CATA video footage.  He found the person he believed to be Petitioner.  (*Id.*, PageID.558-559.)

Detective St. Aubin coordinated with the Michigan State Police fugitive team to track down Petitioner's location by the location of his phone or phones.  Petitioner was arrested in the Detroit area on December 22, 2011.  (*Id.*, PageID.559-560.) Detective St. Aubin then arranged for a physical lineup at the end of February 2012, which included Petitioner.  Ms. Field quickly selected Petitioner, despite the fact that he had grown his hair and a full beard since the time of his arrest.  (*Id.*, PageID.560-561.)  Detective St. Aubin was able to determine that Petitioner and the victim had an altercation on November 7, 2011.  (*Id.*, PageID.577.)

Dr. John Bechinski testified that he had conducted the autopsy on Mr. Dorris. Mr. Dorris died of a gunshot wound to the face, fired from close range.  (*Id.*, PageID.569-571.)  The bullet entered the jaw, exited, reentered the neck, and came to rest in the upper left chest area.  Dr. Bechinski recovered the bullet at the end of the wound track.  (*Id.*, PageID.571-572.)

Petitioner exercised his right not to testify, and the defense presented no witnesses.  (*Id.*, PageID.575.)  Petitioner moved for a directed verdict on the ground that, in light of extensive impeachment, insufficient credible evidence supported the finding that Petitioner was the shooter.  The court denied the motion.  (*Id.*, PageID.579-580.)  The following morning, the Court found that no factual basis existed for instructing on the lesser offenses of voluntary manslaughter and

involuntary manslaughter.  (T. Tr. V, ECF No. 6-11, PageID.583.)

After closing arguments and jury instructions, the jury deliberated two and one-half hours before finding Petitioner guilty of first-degree murder, felon in possession of a firearm, and felony firearm.  (*Id.*, PageID.601.)  The court sentenced Petitioner on February 27, 2013, to respective terms of life imprisonment, four to ten years, and two years.  (Sentencing Tr., ECF No. 6-12, PageID.609-610.)

Petitioner appealed his convictions to the Michigan Court of Appeals.  In the brief filed by counsel on September 19, 2013, Petitioner raised the first four issues presented in his habeas petition.  (Def.-Appellant's Br. on Appeal, ECF No. 6-13, PageID.636.)  Petitioner filed a *pro per* supplemental brief on appeal, raising the fifth issue presented on habeas review.   In an unpublished opinion issued on September 11, 2014, the court of appeals denied all appellate grounds and affirmed the convictions and sentences.  (Mich. Ct. App. Op., ECF No. 6-13, PageID.613-617.)

Petitioner sought leave to appeal to the Michigan Supreme Court and moved for a remand to conduct a hearing on the ineffective assistance of counsel.   On June 30, 2015, the supreme court denied leave to appeal and denied the motion to remand.  (Mich. Ord., ECF No. 6-14, PageID.732.)

Petitioner filed a motion for relief from judgment in the Ingham County Circuit Court on March 3, 2016.  In his motion, Petitioner somewhat incoherently argued that the district court lacked jurisdiction to conduct the preliminary examination and that the circuit court lacked jurisdiction to try him for his offenses.  In an order issued on July 5, 2016, the circuit court denied the motion as meritless and denied an

evidentiary hearing as unnecessary.  (7/5/2016 Cir. Ct. Order, ECF No. 6-16, PageID.854-862.)  In another abstruse motion, Petitioner sought reconsideration. (Mot. for Reconsid., ECF No. 6-17, PageID.864-867).  The court denied that motion on August 9, 2016.  (8/9/2016 Cir. Ct. Ord., ECF No. 6-18, PageID.870-872.)

Petitioner did not seek leave to appeal from the denial.[4]

II.    AEDPA standard

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."

---

[4] Eleven months after he filed his habeas application in this Court, Petitioner filed a motion to amend his habeas application to include three new issues, which he contended related back to his first and fifth habeas grounds, and he sought to stay the habeas proceedings pending exhaustion of the new grounds in the state courts. The Court denied the motion to amend the petition, as the new issues did not relate back and therefore were time-barred.  (12/4/17 Ord., ECF No. 9, PageID.899-903.) Petitioner moved for reconsideration, which the court denied on December 29, 2017. (12/29/2017 Ord. on Reconsid., ECF No. 13, PageID.922-925.)

*Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

III.   Grounds I & V:  Sufficiency of the Evidence

In his first ground for relief, Petitioner contends that the prosecutor presented insufficient evidence identifying Petitioner as the shooter.  In Ground V, Petitioner argues that his rights were violated when the prosecution failed to definitively identify Petitioner as the shooter.  Both questions rest on the same claim that the evidence of identification was insufficient to support the conviction.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to

the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals addressed this issue:

> Here, Field testified that defendant shot the victim.  Although she did not see his face, she identified defendant by his distinctive walk and dark green jacket.  Johnson testified that she saw defendant running from the scene with a gun in his hand, and Whalen saw defendant running from the scene as well.  In addition, Wagemaker testified that he saw defendant west of the CATA bus station a few minutes after the shooting, which was consistent with testimony and video surveillance indicating that the suspect ran west.  Further, Brown testified that defendant described to him his role in the homicide.  This evidence was sufficient to prove defendant's identity as the shooter beyond a reasonable doubt.
>
> To the extent that defendant challenges the credibility of each witness, such credibility determinations are for the jury and cannot warrant reversal under a claim of insufficient evidence.  *Wolfe*, 440 Mich at 514-515.  Moreover, defense counsel carefully impeached each witness with his or her previous inconsistent statements, so any credibility issues were fairly presented to the jury.  While defendant emphasizes that Field initially failed to identify him as the shooter when she was questioned by the police, it is noted that several witnesses testified that Field repeatedly identified defendant as the shooter in the immediate aftermath.  Field's immediate identification of defendant at the CATA bus station but not at the police station supports her explanation that she was reluctant to cooperate with the police while the victim was still alive, not that she was uncertain about defendant's identity as the shooter.
>
> In his Standard 4 brief, defendant argues that the government failed to investigate other suspects, so it is possible that he was not the shooter.  However, the prosecutor "need not negate every reasonable theory consistent with innocence." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).  It was reasonable for the police and the prosecution to focus entirely on defendant given the eyewitness testimony.

(Mich. Ct. App. Op., ECF No. 6-13, PageID.614-615 (footnotes omitted).)

Although the court of appeals did not cite federal case law, the standard it

applied was on all fours with the *Jackson* standard.  Indeed, the standard set forth

23

in *People v. Wolfe*, 489 N.W.2d 748, 751 (Mich. 1992), on which the court of appeals predominantly relied, was drawn expressly from *Jackson*, 443 U.S. 307.

Moreover, the court of appeals reasonably applied the *Jackson* standard to the facts of the case.  Petitioner bases his argument almost exclusively on the fact that the witnesses who identified him, particularly Mollie Field and Tedessa Kemp, provided somewhat different information to the police than they did at the preliminary examination and trial.  Petitioner argues that their conflicting stories rendered their testimony not credible.  As the *Jackson* Court recognized, however, credibility determinations lie with the factfinder.  *Jackson*, 443 U.S. at 319.  They are not subject to reevaluation on habeas review.  *See Herrera*, 506 U.S. at 401-02.

In any event, the jury's determinations of these witnesses' credibility were patently reasonable.  The discrepancies in the witnesses' stories were thoroughly explored and argued to the jury by both the prosecutor and defense counsel.  And, notwithstanding Petitioner's complaints, Petitioner was identified by Ms. Field in her first urgent screams at the station, notwithstanding her later brief attempt to avoid snitching to the police.  Further, along with Ms. Field, three other witnesses identified Petitioner without equivocation:  Ms. Kemp, Ms. Whalen, and Mr. Wagemaker.

Regardless of any discrepancy in any witness' testimony, the evidence, both circumstantial and direct, amply supported the jury's conclusion that Petitioner was the shooter.  Petitioner utterly fails to overcome the double deference owed to the state court's disposition of Petitioner's first and fifth habeas grounds.  *Davis*, 658 F.3d

at 531.

IV.    Ground II:  Improper Admission of Hearsay Evidence

Petitioner argues that the trial court erred by admitting the hearsay statement of the bicyclist, contending that the admission deprived him of a fair trial.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state court's wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief simply because it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in

25

conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met this difficult standard.

The trial court addressed Petitioner's hearsay objection and found no error in the admission of the testimony:

> Hearsay is generally inadmissible unless otherwise provided by the rules of evidence. See MRE 802. The statement at issue attributed to the unidentified bicyclist ("you killed my ears with that") was hearsay because it was admitted to prove the truth of the matter asserted, i.e., that defendant affected the bicyclist's hearing in some way, presumably by firing a gun. Under MRE 803(1), a hearsay statement is admissible if it describes or explains "an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." MRE 803(1). "The admission of hearsay evidence as a present sense impression requires satisfaction of three conditions: (1) the statement must provide an explanation or description of the perceived event, (2) the declarant must personally perceive the event, and (3) the explanation or description must be substantially contemporaneous with the event." *People v Hendrickson*, 459 Mich 229, 236; 586 NW2d 906 (1998) (citation and internal quotation marks omitted). Each condition must be independently corroborated, so a present-sense impression cannot provide its own foundation for admissibility. *Id.* at 237.
>
> The first condition was satisfied. The statement clearly did not "explain" the perceived event, but it was reasonable to conclude that the statement "described" it. The perceived event was the gunshot, and the statement implicitly described (1) the gunshot as loud, and (2) defendant as the cause of the gunshot. The second condition was satisfied because it is at least reasonable to infer that the declarant (the bicyclist) personally perceived the shooting by hearing it, as a bicyclist was seen on the surveillance video traveling in the shooter's westerly direction after the shooting. Thus, the surveillance video provided the necessary independent corroboration. The third condition was satisfied because the lapse of about two minutes between the shooting and the statement, as established by Wagemaker's testimony, was substantially contemporaneous. See *Hendrickson*, 459 Mich at 236 (four-minute

lapse).    Wagemaker's testimony also provided the necessary independent corroboration.    Thus, the trial court did not abuse its discretion by admitting the testimony under MRE 803(1).

(Mich. Ct. App. Op., ECF No. 6-13, PageID.615-616).

To the extent that Petitioner continues to argue that the evidence was improper hearsay, the question is one of state law, not cognizable on habeas review. *Estelle*, 502 U.S. at 67-68.  In addition, the Michigan Court of Appeals decided the evidentiary question against him.  The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).

Moreover, Petitioner fails to demonstrate that the admission of hearsay testimony violated his right to a fair trial.  "The first and most conspicuous failing in [the petitioner's] petition is the absence of a Supreme Court holding granting relief on his due process theory: that the admission of allegedly unreliable hearsay testimony violates the Due Process Clause.  That by itself makes it difficult to conclude that the state court of appeals' decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Desai v. Booker*, 732 F.3d 628, 630 (6th Cir. 2013) (quoting 28 U.S.C. § 2254(d)).  In the absence of clear Supreme Court authority, no basis exists for concluding that the evidence rendered Petitioner's trial fundamentally unfair.

V.    Ground III:  Improper References to Petitioner as the Shooter

In his third ground for relief, Petitioner argues that the lead investigator improperly referred to Petitioner as the shooter, rather than as the suspect.  He asserts that the error was plain, that trial counsel was ineffective in failing to challenge the use, and that the statements deprived Petitioner of a fair trial.

The Michigan Court of Appeals addressed the issue as follows:

> Defendant argues that a detective improperly opined while testifying that defendant was the shooter.  In response to a question by the prosecution on re-direct examination, the detective testified that "the shooter fled the scene. Was not arrested until two days after the fact in Detroit."  On re-cross examination, defense counsel asked the detective to clarify that defendant was the "suspect," not the "shooter." The detective answered, "I believe he is the shooter." We review this unpreserved claim of nonconstitutional error for plain error affecting substantial rights, meaning that we will reverse only if a plain error occurred, and the defendant was actually innocent or the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of innocence. *People v Knox*, 469 Mich 502, 508; 674 NW2d 366 (2004).

> Even if we were to agree that the detective's testimony constituted plain error, we find it harmless in light of the overwhelming evidence of defendant's guilt.  The video surveillance showed a person matching defendant's description acting in a suspicious manner shortly before the shooting and running west of the CATA bus station immediately after the shooting. Two witnesses clearly saw defendant's face as he ran away from the CATA bus station, and another witness saw defendant west of the CATA bus station a few minutes after the shooting.  More importantly, Field was familiar with defendant and identified him as the shooter.  Finally, Brown testified that defendant admitted his role in the homicide.  The video surveillance, eyewitness testimony, and confession overwhelmingly established defendant's guilt.[5]

_____

[5] Similarly, defendant has failed to establish that, but for his attorney's failure to object to the detective's unresponsive testimony and to request a curative instruction, a different outcome would have resulted.  *People v Werner*, 254 Mich App 528, 534; 659 NW2d 688 (2002).

28

(Mich. Ct. App. Op., ECF No. 6-13, PageID.616-617.)

Respondent contends that Petitioner's third ground is procedurally defaulted, because Petitioner failed to raise a timely objection and the court of appeals denied relief because the question was not preserved.  Petitioner counters that ineffective assistance of counsel excuses his procedural default.

"If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings, as state law may require – procedural default will bar federal review." *Magwood v. Patterson*, 561 U.S. 320, 340 (2010).  Nevertheless, the United States Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court will proceed directly to the merits. *See Hudson*, 351 F.3d at 215-16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

Petitioner cannot demonstrate that Detective St. Aubin's remarks affected Petitioner's right to a fair trial.  As discussed, a state-court evidentiary ruling does not rise to the level of a due process violation unless it offends a fundamental principle of justice. *Seymour*, 224 F.3d at 552 *accord Coleman,* 268 F.3d at 439; *Bugh*, 329 F.3d at 512.  Here, no such fundamental error occurred; the Supreme Court has never held that a witness' brief mention of his or her belief in the defendant's guilt violates due process.

Moreover, on habeas review, a court may not grant relief based on trial error that was harmless under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *See Davis v. Ayala*, 135 S.Ct. 2187, 2197-98 (2015); *Fry v. Pliler*, 551 U.S. 112, 120-21 (2007); *Hargrave v. McKee*, 248 F. App'x 718, 728 (6th Cir. 2007) (citing s*ee also Vasquez v Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007).  The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result.  *Brecht*, 507 U.S. at 638. In determining whether the restriction was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave*, 248 F. App'x at 728 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

Here, Detective St. Aubin's comments were brief, added little to the jury's

likely supposition that the lead detective believed that the right man was on trial, and paled in the context of the substantial evidence against Petitioner – evidence characterized by the state court as "overwhelming."  (Mich. Ct. App. Op., ECF No. 6-13, PageID.617.)  The state court concluded that any error by Detective St. Aubin was harmless.  That determination represented a reasonable application of the *Brecht* standard.  Petitioner therefore is not entitled to relief on his third habeas ground.

VI.     Ground IV:  Denial of Voluntary Manslaughter Instruction

Petitioner argues that the trial court impermissibly denied him an instruction on the lesser-included offense of voluntary manslaughter.  He asserts that the denial resulted in a fundamentally unfair trial.

The Michigan Court of Appeals rejected Petitioner's claim, holding that the evidence did not support an instruction for voluntary manslaughter:

> "[W]hen a defendant is charged with murder, an instruction for voluntary . . . manslaughter must be given if supported by a rational view of the evidence." *People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003). "The elements of voluntary manslaughter are (1) the defendant must kill in the heat of passion, (2) the passion must be caused by an adequate provocation, and (3) there cannot be a lapse of time during which a reasonable person could control his passions." *People v Sullivan*, 231 Mich App 510, 518; 586 NW2d 578 (1998).

> In this case, the evidence does not support a finding that defendant acted in the heat of passion. The evidence revealed that defendant and the victim fought on November 7, 2011. The period between the November 7, 2011, fight and the December 20, 2011, shooting was more than sufficient for a reasonable person to control his or her passions. See *People v Pouncey*, 437 Mich 382, 385, 392; 471 NW2d 346 (1991) (30 seconds constituted adequate "cooling-off period"); *People v Wofford*, 196 Mich App 275, 280; 492 NW2d 747 (1992) (trial court erred in ruling that 24 hours did not constitute "cooling-off period"). Moreover, Brown testified that defendant stated that after the victim was released from jail, he "went down there and took care of

business." Defendant's argument that the fight could not be a motive for the murder without also forming the basis for voluntary manslaughter is misplaced. See *People v Gjidoda*, 140 Mich App 294, 298; 364 NW2d 698 (1985). Moreover, when a jury finds a defendant guilty of first-degree murder and rejects a verdict of second-degree murder, failure to instruct the jury on voluntary manslaughter is necessarily harmless error. See *Sullivan*, 231 Mich App at 520. Here, the jury found defendant guilty of first-degree murder and rejected a charge of second-degree murder, so any possible error in failing to instruct the jury on voluntary manslaughter was harmless.

(Mich. Ct. App. Op., ECF No. 6-13, PageID.617.)

Petitioner argues that voluntary manslaughter is a necessarily included offense of murder, necessitating the giving of a jury instruction. (Def.-Appellant's Br. on Appeal, ECF No. 1-13, PageID.662 (citing *People v. Mendoza*, 664 N.W.2d 685, 692 (Mich. 2003)). Both voluntary manslaughter and murder "require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." *Mendoza*, 664 N.W.2d at 692. Manslaughter is distinguished from murder when the element of malice required for murder "is negated by the presence of provocation and the heat of passion." *Id.* In other words, such an instruction is only required under Michigan law when a "rational view of the evidence" supports the instruction. *Id.*

The Sixth Circuit Court of Appeals, sitting en banc, has held that the failure to give an instruction on a lesser-included offense, even when requested by counsel, is not of the "character or magnitude which should be cognizable on collateral attack." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc). The *Bagby* Court held that failure to instruct on lesser-included offenses in a noncapital case is reviewable

in a habeas corpus action only if the failure results in a miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair procedure. *Id.*; *accord Tegeler v. Renico*, 253 F. App'x 521, 524 (6th Cir. 2007); *Todd v. Stegal*, 40 F. App'x 25, 28-29 (6th Cir. 2002); *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002); *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001); *Samu v. Elo*, 14 F. App'x 477, 479 (6th Cir. 2001); *Williams v. Hofbauer*, 3 F. App'x 456, 458 (6th Cir. 2001).

Shortly after the Sixth Circuit decision in *Bagby*, the Supreme Court emphasized that the fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief.  *Estelle*, 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983)).  Instead, the only question on habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 14 (1973)), *cited in Todd*, 40 F. App'x at 29.   Here, there exists no miscarriage of justice or fundamental defect in due process, as the evidence wholly fails to support a claim that Petitioner was acting in the heat of passion. Furthermore, no clearly established Supreme Court authority requires lesser-included offense instructions in non-capital cases.  Accordingly, under the AEDPA, this claim is not a basis for habeas relief.  *Todd*, 40 F. App'x at 28 (citing *Estelle*, 502 U.S. at 71-72)).

### Certificate of Appealability

Unless a certificate of appealability is issued, an appeal of the denial of a habeas corpus petition may not be taken.  28 U.S.C. § 2253(c)(1).  A certificate should

issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists would not conclude that this Court's denial of Petitioner's claims is debatable or wrong.

## **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.

Dated:  January 17, 2018              /s/  Phillip J. Green
                                      PHILLIP J. GREEN
                                      United States Magistrate Judge


### NOTICE TO PARTIES

ANY OBJECTIONS to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice.  *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).